People v Britt (2018 NY Slip Op 02390)





People v Britt


2018 NY Slip Op 02390


Decided on April 5, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 5, 2018

Acosta, P.J., Sweeny, Andrias, Gische, Gesmer, JJ.


5471 1173/14

[*1]The People of the State of New York, Respondent,
v
Clinton Britt, Defendant-Appellant.


Seymour W. James, Jr., The Legal Aid Society, New York (David Crow of counsel), and Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York (Jenny C. Wu of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Sheila L. Bautista of counsel), for respondent.



Judgment, Supreme Court, New York County (Anthony J. Ferrara, J. at suppression hearing; Patricia M. Nuñez J. at jury trial and sentencing), rendered May 21, 2015, convicting defendant of criminal possession of a forged instrument in the first degree (17 counts) and criminal possession of a controlled substance in the seventh degree, and sentencing him, as a second felony offender, to an aggregate term of three to six years, unanimously affirmed.
On March 9, 2014, Police Officer Ryan Lathrop and Sergeant Robert Dixon were in uniform, patrolling in Times Square. The area had a high number of quality of life crimes, and was "flooded" with police officers. On the north side of 42nd Street and Eighth Avenue was a haunted house tourist attraction called Times Scare. At about 11:15 p.m., Lathrop saw defendant with a group of people in front of Times Scare, drinking a beverage concealed in a brown paper bag. As Lathrop approached, defendant went into Times Scare, and Lathrop ran in after him. Inside, Lathrop caught up with defendant, grabbed him by the arm, and saw that the brown bag contained an alcoholic beverage.
Lathrop brought defendant outside and radioed that he had someone in custody, and Sergeant Dixon arrived within a minute. Although Lathrop planned to issue a summons, defendant's identification cards did not show his date of birth or home address, so, in accordance with police department policy, Lathrop arrested defendant. The officer handcuffed him and searched him for weapons. Defendant asked if he could give his property to his brother Jeff, who worked nearby. Initially, Lathrop agreed, and began collecting defendant's personal property. He retrieved two cell phones, keys, a lanyard with defendant's employee identification cards, an identification card for a man named Douglas Kelly, headphones, and a toothbrush. From defendant's pants pocket, Lathrop recovered a small pink Ziploc bag of what appeared to be crack cocaine. While still handcuffed, defendant started making a "weird like jumping" or "hopping movement," and began "getting really upset" about being "brought in." Lathrop then noticed two more Ziploc bags at defendant's feet containing what appeared to be crack cocaine [FN1]. Because he had recovered drugs, the officer collected defendant's property to be vouchered, rather than giving it to defendant's brother.
At the precinct, in response to pedigree questions, defendant told Lathrop that he was unemployed. Lathrop pulled two separate wads of currency from defendant's inside left jacket pocket, one of which was folded with a rubber band around it.
First, Lathrop counted the unbanded wad of, which totaled $148. When he began counting the money in the rubber band, he realized immediately that it was counterfeit. All of the $10 bills [*2]had the same serial number, and there were three different serial numbers on the 13 $20 bills. There was a total of $300 in counterfeit bills.
As Lathrop brought defendant back to the holding area, defendant said, in a quiet voice under his breath, "I want to talk to a detective, and I will give up who I got the currency from, the counterfeit bills from, if you make the drug charges go away." Once in the cell, defendant admitted that the pink bag of drugs was his, explaining that he had hurt his back and used the dugs for the pain.
Secret Service Agent Michael Helm trained in the detection of counterfeit currency, identified the $300 that had been rubber-banded together as counterfeit bills. Helm explained that these were not "the highest grade bills." Although real money is made of cotton, the bills that defendant had were made of paper that could be bought in a store. They did not have the optical variable ink, watermark, red and blue fibers, and security strip that appear on genuine currency. Additionally, while genuine bills all have a unique serial number, several of defendant's bills had the same serial number.
In Helm's experience, people passing counterfeit bills would keep their genuine currency and their counterfeit currency in separate pockets. Helm had only made "a couple" of arrests for counterfeit currency. He said that none were street arrests, "because the federal government generally does not prosecute low-level street arrests."
The court properly denied defendant's suppression motion. An officer observed defendant drinking a beverage concealed in a paper bag. Based on his experience, the officer concluded that defendant was drinking in that manner for the purpose of concealing a violation of the Open Container Law (Administrative Code of City of NY § 10-125). Even if drinking from a can covered by a bag could have innocent explanations, this act, coupled with defendant's active flight at the approach of the police (see People v Moore, 6 NY3d 496, 500-501 [2006]) created at least reasonable suspicion justifying pursuit (see People v Bothwell, 261 AD2d 232, 234-235 [1st Dept 1999], lv denied 93 NY2d 1026 [1999]). When he stopped defendant, the officer saw that the bag contained an alcoholic beverage, whereupon the officer recovered drugs and counterfeit money during a lawful search incident to arrest.
Defendant's arguments concerning the sufficiency and weight of the evidence supporting his convictions of possession of forged instruments are unavailing (see People v Danielson, 9 NY3d 342, 348-349 [2007]). The evidence supports inferences that defendant knowingly possessed counterfeit money, and did so with the requisite fraudulent intent (see Penal Law § 170.30).
The evidence showed, among other things, that defendant kept these bills in a bundle that was separate from his genuine money, and that the material from which the bills were made and their appearance were noticeably different from those of genuine currency. Moreover, defendant's statement to the police could be fairly interpreted as acknowledging that he knew the bills were counterfeit, and had not just learned that fact upon his arrest. Accordingly, the jury could reasonably have inferred from the totality of the evidence that defendant knew the money was counterfeit (see People v Bogan, 80 AD3d 450 [1st Dept 2011], lv denied 16 NY3d 856 [2011]).
The evidence also supported the jury's determination that defendant intended to use the counterfeit bills to deceive or defraud. While there is no presumption that knowing possession of counterfeit money establishes intent (People v Bailey, 13 NY3d 67, 72 [2009]), the evidence here went beyond mere possession. Defendant carried 17 bills in $10 and $20 denominations, totaling $300. Furthermore, defendant separated the counterfeit bills from his genuine currency by securing them with a rubber band, which suggested an intent to use the counterfeit bills selectively, in situations where they would be least likely to be detected. Based on this combination of factors, and the exercise of common sense, the jury could reasonably have concluded that defendant had no reason to carry these counterfeit bills except to spend them, as soon as the opportunity arose (see People v Rodriguez, 17 NY3d 486 [2011]), and we see nothing in Bailey, where defendant was arrested for attempting to steal a handbag after police observed him for over an hour attempting to steal from unsuspecting women, to preclude this analysis. Although the defendant in Bailey had three $10 counterfeit bills in his pocket, there was no [*3]indication that he intended to defraud, deceive or injure another with counterfeit bills, only that he intended to steal real currency from his intended victims (13 NY3d at 69, 72 and n 2).
Defendant's challenge to the Secret Service agent's testimony about people commonly keeping real and counterfeit money in separate pockets is unpreserved, because defendant only made an unelaborated objection when the testimony was given (see People v Tevaha, 84 NY2d 879 [1994]), and because his somewhat more specific objection at the end of the trial was grossly untimely (see People v Romero, 7 NY3d 911, 912 [2006]). We decline to review defendant's claims in the interest of justice. As an alternative holding, we find that the agent's experience
was a sufficient basis for the testimony, which did not offer an opinion on the ultimate issue of defendant's intent, or otherwise usurp the jury's fact-finding function.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: APRIL 5, 2018
CLERK



Footnotes

Footnote 1: The substance in the pink bag found in defendant's pocket tested positive for cocaine. The clear plastic bag found at defendant's feet contained Methylone, known as ecstasy.